KENNEDY BERKLEY YARNEVICH
& WILLIAMSON, CHARTERED
119 West Iron Avenue, 7th Floor
P.O. Box 2567
Salina, Kansas 67402-2567
(785) 825-4674 [Telephone]
(785) 825-5936 [Fax]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

EMORI DODSON,                                      )
                                                  )
                              Plaintiff,           )
                                                  )
vs.                                               )    Case No. 18-CV-04034
                                                  )
FLYING DOVE, INC. D/B/A IHOP #2045,               )
                                                  )
                              Defendant.          )
_____      )

**PLAINTIFF'S MEMORANDUM BRIEF
IN OPPOSITION TO DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Emori Dodson ("Emori") hereby submits the following memorandum brief in opposition to the motion for summary judgment filed herein by Defendant Flying Dove, Inc. d/b/a IHOP #2045 ("IHOP"). For the reasons that follow, Emori respectfully submits that IHOP's motion for summary judgment should be denied in its entirety and that the case be allowed to proceed to trial on the merits.

## <u>NATURE OF THE CASE</u>

Emori is a former employee of IHOP and worked as a server. She had her schedule alters and was terminated, however, after she became pregnant by the general manager's brother-in-law. Both the general manager and the father of Emori's child are Arab Muslims, while Emori is a white Christian. Emori alleges that her termination was unlawful and has asserted claims

under Title VII of the Civil Rights Act for discrimination on the basis of sex, pregnancy, race and religion.

## RESPONSE TO DEFENDANT'S
## STATEMENT OF UNCONTROVERTED FACTS

1. Uncontroverted.

2. Uncontroverted.

3. Uncontroverted.

4. Controverted; Emori alleges a number of behaviors by Saleh that are neither kind nor agreeable, including his attempts to coerce her to "get rid" of her baby. In addition to Emori, other women have also made similar allegations of sexual harassment or discrimination against Saleh. These allegations include disparate treatment, inappropriate language and failure to discipline male employees who commit sexual harassment or intimidation. For example, a former assistant manager of the IHOP indicates that she was called a "cunt" by a male co-worker, she complained to Saleh but no action was taken. In addition, Fares threatened to beat up a female employee and put her in a coma and Saleh again took no action after being told of the behavior. [Affidavit of Emori Dodson, attached hereto as Exhibit "A"; Affidavit of Jessica Liles, attached hereto as Exhibit "B"; Affidavit of Hailey Wright, attached hereto as Exhibit "C"; Affidavit of Randie Schlichting, attached hereto as Exhibit "D"].

5. Controverted; see response to paragraph 4.

6. Controverted; see response to paragraph 4.

7. Uncontroverted.

8. Controverted; Emori did not review the employee handbook. She interviewed with a substitute manager by the name of Chris Brunghart. He provided a very informal interview, tossed the handbook to her and said "read it or don't, every restaurant is the same, right?" Emori

does not recall if she was required to sign the handbook.  [Exhibit "A"].

9.  Uncontroverted.

10. Uncontroverted.

11. Uncontroverted.

12.  Controverted; Emori does not recall ever watching a video.  She interviewed with a substitute manager by the name of Chris Brunghart.  Emori told him she had about 9 years of experience as a server and he told her "then you know how a kitchen and the cooks can be, just ignore it."  [Id.].

13. Uncontroverted; however, see responses to Paragraphs 8 and 12.

14.  Controverted; Emori was not aware of this policy because she was not required to read the handbook by Mr. Brunghart when she was hired.  [Id.].  In addition, the record shows numerous attempts by Emori, Hailey Wright, Jessica Liles and Randi Schlichting to obtain relief from harassment of co-workers or themselves with no action taken in response.  [Exhibits "A", "B", "C" and "D"].

15. Uncontroverted; however, see response to Paragraph 14.

16. Uncontroverted; however, see response to Paragraph 14.

17. Uncontroverted; however, see response to Paragraph 14.

18. Uncontroverted; however, see response to Paragraph 14.

19.  Controverted; being "full time" at a restaurant like IHOP is not based on the number of hours worked; rather, it is the specific schedule that is critical.  Emori was initially working the evenings/nights on weekends, which allowed her to earn as much in tips as a server working all day Monday through Friday.  When Emori complained about her hours, it was not the number of hours worked that was important, it was the shifts that she was assigned to.  For example, working

the day shift on a Saturday was a very slow time that would generate very small tips. [Id.]. In addition, Hailey Wright, who was an assistant mangager, was told by Saleh that she could schedule anyone except for Emori. Ms. Wright assumed this directive was due to the relationship between Emori and Fares. [Exhibit "C"].

20. Controverted; see response to Paragraph 19.

21. Uncontroverted.

22. Uncontroverted.

23. Uncontroverted.

24.     Controverted; Emori's alleged attendance issues were not excessive or out of line with other employees. [Exhibits "A" and "B"].

25.     Uncontroverted that Emori was tardy on this occasion; however, see response to Paragraph 24.

26.     Uncontroverted that Emori was tardy on this occasion; however, see response to Paragraph 24.

27.     Uncontroverted that Emori was tardy on this occasion; however, see response to Paragraph 24.

28.     Uncontroverted that Emori was tardy on this occasion; however, see response to Paragraph 24.

29.     Uncontroverted that Emori was tardy on this occasion; however, see response to Paragraph 24.

30.     Controverted; the cited text message does not reveal an alleged recognition by Emori that Saleh was unhappy with her attendance. In addition, see response to Paragraph 24.

31.     Uncontroverted that Emori was tardy on this occasion; however, see response to

Paragraph 24.

32.    Controverted; the cited text message does not indicate that Saleh had been working Emori too hard; rather, she expresses that she is tired from working and also trying to keep up with her studies.

33.    Controverted; Emori did not engage in sexual harassment and alleges a number of behaviors by Saleh that constitute sexual harassment or discrimination by him and/or Fares.  In addition to Emori, other women corroborate sexual harassment or discrimination against Saleh and Fares.  These allegations include disparate treatment, inappropriate language and failure to discipline male employees who commit sexual harassment, threats or intimidation.  [Exhibits "A", "B", "C" and "D"].  See also response to Paragraph 4.

34.    Controverted; Emori denies bragging that customers wanted to sleep with her.  It was very common for all of the servers to receive unsolicited phone numbers from customers, especially from customers who had been at the bars.  [Exhibit "A"].

35.    Controverted; Emori denies having a "fling" with an owner and denies bragging about same.  [Id.].

36.    Controverted; the sex toy was actually purchased by Fares, who asked Emori to give it to Saleh as a gag gift on his birthday.  Fares and Emori gave the gift to Saleh, who merely smiled and walked away, giving no indication that he was offended.  [Id.].

37. Controverted; Emori never "dated" Hassan Issa, who had a girlfriend in Wichita.  [Id.].

38.    Controverted; Emori never stated she wanted to get pregnant by Hassan Issa or any Muslim.  [Id.].

39. Controverted; see responses to Paragraphs 4 and 33.

40. Uncontroverted.

41.     Controverted;  Emori disclosed the relationship but she never "bragged" about it or indicated she wanted to get pregnant by Fares.  [Id.].

42.     Controverted;  Emori denies this paragraph. [Id.].

43.     Controverted;   Emori denies making this statement and has no knowledge of whether Fares' family is wealthy or not.  [Id.].

44.     Controverted; Emori had an upgrade available and purchased the phone for Fares because he had an old phone.  She did not purchase it to "keep tabs" on Fares and had no idea how to use a tracker feature anyway.  [Id.].

45.     Controverted; Emori denies coming "unglued" if she thought Fares was looking at other women.  [Id.].

46.     Controverted; Emori denies threatening other female employees.  [Id.].

47.     Controverted;  Emori denies having a history or threatening behavior.  [Id.].  In addition, Emori objects to the underlying evidence as being irrelevant and inadmissible pursuant to F.R.E. 401 and 404(b).  The police report in question is immaterial to how Emori acted at work and is irrelevant as to whether she was terminated in violation of the law.

48.     Controverted; Emori denies being a source of workplace stress for other employees or that other employees felt she was "crazy" or "psycho."  [Exhibits "A" and "B"].

49.     Controverted; Emori denies being a source of workplace stress for other employees or that other employees felt she was "crazy" or "psycho."  [Id.].

50. Uncontroverted; however, see responses to Paragraphs 48 and 49.

51. Uncontroverted.

52. Controverted; see responses to Paragraphs 48 and 49.

53. Uncontroverted.

54.     Emori objects to the underlying evidence as being irrelevant and inadmissible pursuant to F.R.E. 401 and 404(b).  Whether Emori was stopped for a DUI three months prior to her termination or was in possession of drugs is irrelevant to her claims of discrimination against IHOP.

55.     Emori objects to the underlying evidence as being irrelevant and inadmissible pursuant to F.R.E. 401 and 404(b).  Whether Emori was stopped for a DUI or was in possession of drugs is irrelevant to her claims of discrimination against IHOP.

56.     Emori objects to the underlying evidence as being irrelevant and inadmissible pursuant to F.R.E. 401 and 404(b).

57.     Emori objects to the underlying evidence as being irrelevant and inadmissible pursuant to F.R.E. 401 and 404(b).  The statements of the investigating officer also constitute hearsay as to his recommendations.  See F.R.E. 802.

58.     Controverted; Emori was never fired from a job due to "illicit drug activity." [Exhibit "A"].  In addition, Emori objects to the underlying evidence as being irrelevant and inadmissible pursuant to F.R.E. 401 and 404(b).

59. Controverted; Emori denies attempting to sell drugs to other employees.  [Id.].

60.     Controverted; Emori denies that Saleh ever expressed concern to her regarding drug use.  [Id.].

61. Controverted;  This text exchange does not suggest anger on the part of Emori.

62. Uncontroverted.

63.     Controverted; IHOP suggests that the fighting was the fault of Emori and Fares equally, but in fact the fighting was usually instigated by Fares and Emori was the one who suffered the consequences for the behavior.  [Exhibits "A" and "B"].  This is also corroborated by Ms.

Wright and Ms. Schlichting, who also had items thrown at them or saw items thrown at other female co-workers. [Exhibits "C" and "D"].

64. Uncontroverted.

65. Controverted; See response to Paragraph 63.

66.    Controverted; The cited text messages do not support the claim that Emori was attempting to interfere with how Saleh was scheduling Fares. Instead, it appears that Emori was indicating that IHOP was shorthanded and needed Fares to stay.

67.    Controverted; Fares was with Emori while she was texting with Saleh and he was prompting her what to say to Saleh so that he would allow Fares to take the time off. Fares wanted the time off, it was not all Emori making the request. [Exhibit "A"].

68. Uncontroverted.

69. Uncontroverted.

70.    Controverted; Emori denies knocking on the door so hard that she was going to break the door down and was merely using a firm knock. She had drunk some alcohol that night, but I was not under a heavy influence of alcohol and had not taken any drugs. She was crying, but she was not screaming. She does not know why the police were called but did not believe anything was taking place that it was necessary to call the police. She never saw the police and did not leave because she saw the police coming.

71.    Controverted; Emori's text messages to Saleh were not incoherent and the reason she was trying to get ahold of Fares was because he had a key to her apartment that she wanted returned. [Exhibit "A"].

72. Uncontroverted.

73. Uncontroverted.

74.    Controverted;  Emori was a good employee who showed up for her shifts and was well liked by the customer.  [Exhibit "B"].

75. Uncontroverted.

76. Uncontroverted.

77. Uncontroverted.

78. Uncontroverted.

79. Uncontroverted; however, see response to Paragraph 24.

80.    Controverted; Emori denies making an excessive number of uninvited visits to Saleh's home and that is where Fares was staying at the time.  [Exhibit "A"].

81. Uncontroverted.

82.    Uncontroverted; however, Emori apologized and explained that she left because of how she was feeling.  Emori would also point out that Saleh did not appear to be angry with any of the other servers who were also working that shift.  It should also be noted that while Saleh threatened to write Emori up for leaving a messy table he would take no action against Fares for throwing things at female co-workers or threatening to put one in a coma.

83. Uncontroverted.

84. Uncontroverted; however, see response to Paragraph 24.

85. Uncontroverted.

86. Uncontroverted; however, see response to Paragraph 19.

87.    Controverted; the cited text messages do not suggest that Emori was trying to bate Saleh into a religious or family discussion.

88. Controverted; See response to Paragraph 24.

89.    Controverted; See response to Paragraph 24.  Also, Emori denies seeing or speaking

with Ashley about any alleged attendance issues.  [Exhibit "A"].

90. Controverted; See response to Paragraph 89.

91. Controverted; See response to Paragraph 63.

92. Controverted; See response to Paragraph 63.

93. Controverted; See response to Paragraph 63.

94. Controverted; See response to Paragraph 63.

95. Controverted; See response to Paragraph 63.

96.    Controverted; Emori did not throw anything at Fares, although he threw ice and batter at her.  [Exhibits "A" and "B"].  Fares threw items at other female employees as well. [Exhibits "C" and "D"].

97. Controverted; Emori was not a danger to herself, Fares, Saleh or anyone else. [Id.].

98. Uncontroverted.

99. Uncontroverted.

100.    Controverted; See response to Paragraph 19.

101.    Controverted; Emori did not have a "constant" disregard for shift time and, as set forth above in response to Paragraph 24, her attendance was not out of the norm for other employees at IHOP.

102.    Controverted; the change to Emori's schedule was not caused by her own behavior. See response to Paragraphs 19 and 63.  Moreover, this text exchange demonstrates that Emori was challenging Saleh's behavior as being based on race, religion, culture or the fact she was pregnant. She makes this point not just once, but twice.  Finally, she poses the question why Fares is not sent home too.  The question presumably is based on the fact that Emori was the only one who was disciplined when there was an alleged fight between her and Fares.

103.    Controverted; See response to Paragraphs 63 and 102.  In addition, Emori never went to the IHOP to harass Fares.  [Exhibit "A"].

104.    Uncontroverted.

105.    Controverted; Fares was an average cook and not the best cook working at IHOP at the time.  [Id.].

106.    Controverted; See response to Paragraph 102.

107.    Uncontroverted.

108.    Uncontroverted.

109.    Uncontroverted.

110.    Uncontroverted.

111.    Uncontroverted.

112.    Uncontroverted.

113.    Uncontroverted.

114.    Uncontroverted; however, see response to Paragraph 8.

115.    Controverted; Emori told Saleh when she would be unavailable and even put post-it notes on his desk so he would know ahead.  Emori was having to work other jobs to make up for the fact that Saleh was not scheduling her on her prior schedule.  In fact, this text exchange contains a request by Emori that she be allowed to work her old schedule.  [Exhibit "A"].

116.    Controverted; See response to Paragraph 115.

117.    Controverted; See response to Paragraph 115.

118.    Emori objects to the underlying evidence as being irrelevant and inadmissible pursuant to F.R.E. 401 and 404(b).

119.    Emori objects to the underlying evidence as being irrelevant and inadmissible

pursuant to F.R.E. 401 and 404(b).

120.    Emori objects to the underlying evidence as being irrelevant and inadmissible pursuant to F.R.E. 401 and 404(b).

121.    Uncontroverted that Emori missed work due to sickness associated with her pregnancy.  In addition, see response to Paragraph 24.

122.    Controverted; Emori denies appearing at Saleh's house on this occasion. [Exhibit "A"].

123.    Uncontroverted.

124.    Controverted; as set for above, Emori denies that she was calling and texting "continuously" or "continuously" coming to Saleh's home at all hours.  [Id.].

125.    Uncontroverted.

126.    Uncontroverted.

127.    Uncontroverted; however, the EEOC issued a Dismissal and Notice of Rights in response to Emori's request for same before the EEOC had concluded its investigation. Accordingly, the EEOC never issued a finding on probable cause either way.  [EEOC Right to Sue, attached hereto as Exhibit "E"].

128.    Uncontroverted.

129.    Emori objects to the underlying evidence as being irrelevant and inadmissible pursuant to F.R.E. 401 and 404(b).

130.    Emori objects to the underlying evidence as being irrelevant and inadmissible pursuant to F.R.E. 401 and 404(b).

131.    Emori objects to the underlying evidence as being irrelevant and inadmissible pursuant to F.R.E. 401 and 404(b).

132.    Controverted; Hailey Wright has stated that she was specifically told she could not schedule Emori.  See response to Paragraph 19.

133.    Uncontroverted.

134.    Controverted; Saleh did engage in discrimination.  [Exhibits "A", "B", "C" and "D"].

135.    Controverted; Randie Schlichting indicates that Saleh appeared to have strong cultural beliefs that impacted his attitude toward women.  These cultural beliefs would obviously include his religious beliefs.

136.    Uncontroverted.

137.    Controverted; as set forth above, Saleh did treat female employees differently than male employees.  This difference in treatment was at least to some part attributable to his religious or cultural beliefs.  [Exhibit "D"].

138.    Uncontroverted.

139.    Controverted; see response to Paragraph 137.

140.    Uncontroverted; however, these women were not pregnant by a Muslim male who was also related to Saleh.

141.    Uncontroverted.

142.    Controverted; Saleh does have a history of gender discrimination.  [Exhibits "A" and "B"].  Ironically, one of his former assistant managers who is female has also filed a charge of discrimination with the EEOC.  [Exhibit "D"].

143.    Controverted; Saleh takes no action in response to discriminatory conduct.  [Exhibits "A", "B", "C" and "D"].  See response to Paragraph 4.

13

## ISSUES

IHOP's motion for summary judgment presents the following issue for determination by the Court: Is IHOP entitled to summary judgment on Emori's claims under Title VII, or are there questions of fact that require this case to be submitted to the trier of fact?

## ARGUMENT AND AUTHORITIES

Emori respectfully submits that there are substantial questions of fact that preclude summary judgment in favor of IHOP. For whatever reason, IHOP chose not to take Emori's deposition or the depositions of other critical witnesses in this case and instead is attempting to try the case by affidavit. Federal Courts will not grant summary judgment based on a "battle of affidavits" that raises genuine material disputes of fact. *DeVargas v. Mason & Hanger-Silas Mason Co.,* 844 F.2d 714, 719 (10th Cir. 1988); *Metro. Life Ins. Co. v. Browning*, 839 F. Supp. 1508, 1510 (W.D. Okla. 1993). Accordingly, IHOP's motion for summary judgment should be denied due to the multiple factual isses addressed below.

### Standards of Summary Judgment

A Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The general rules relating to a Courts consideration of a motion for summary judgment are well established. First, the party requesting summary judgment bears the burden of establishing that there is no question of material fact and that he or she is entitled to judgment as a matter of law. *Douglass v. GMC*, 368 F. Supp. 2d 1220, 1227-1228 (D. Kan. 2005). A fact is material if it might affect the outcome of the case. *See id*. Second, this Court must resolve

all doubts against the moving party and will construe all evidence in light most favorable to the

defending party. *Id*. [citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)].

In doing so, this Court should take all factual inferences against the moving party and in favor of

the defending party. *Id*. Third, courts will not weigh the credibility of witnesses or other evidence

and will "generally find summary judgment to be inappropriate where intent, motive or state of

mind are essential elements of the case." *Barber v. General Electric Co.*, 648 F.2d 1272, 1276

(10th Cir. 1981); *6-Pt. 2 Moore's Federal Practice* ¶ 56.18 [8] (2nd Ed. 1988); *Federal Civil Rules

Handbook* 710-13 (West 2000).

As the party requesting summary judgment, IHOP bears the burden of establishing that

there are no questions of material fact. *Douglass*, 368 F.Supp.2d at 1227-1228. When viewing

the totality of the circumstances and the evidence produced by the parties, Emori contends that

application of the above standards to the facts of this case show that IHOP's motion for summary

judgment should be denied.

**General Law Regarding Title VII Claim**

Title VII prohibits employers from discriminating on the basis of sex, race or religion,

among other protected classifications. 42 U.S.C. § 2000e-2(a)(1). Pursuant to the Pregnancy

Discrimination Act of 1978, sex discrimination was expanded to include discrimination on the

basis of pregnancy. 42 U.S.C. § 2000e(k). Accordingly, all four of Emori's claims are subject to

the same analysis and standards in reviewing IHOP's motion for summary judgment.

"The 'factual inquiry' in a Title VII case is '[whether] the defendant intentionally

discriminated against the plaintiff.'" *United States Postal Serv. v. Aikens*, 460 U.S. 711, 715,

(1983) [quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, (1981)]. In

order to prove intentional discrimination, the plaintiff must show the discrimination "either directly

by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. "[A]n existing policy which itself constitutes discrimination" is direct evidence of discrimination. *Ramsey v. City & County of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990), *cert. denied*, 506 U.S. 907, (1992); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 256, (1989) [plurality opinion holding that direct evidence is found in the firm's solicited evaluations containing stereotyping comments relied upon in making employment decisions]; *EEOC v. Wyoming Retirement Sys.*, 771 F.2d 1425, 1430 (10th Cir. 1985) [holding that statute creating age-based employment distinction was direct evidence]. If a plaintiff offers direct evidence of discriminatory intent, the burden-shifting analysis of *McDonnell Douglas* is unnecessary. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, (1985); *Heim v. Utah*, 8 F.3d 1541, 1546 (10th Cir. 1993).

On the other hand, a plaintiff may establish a claim of discrimination indirectly through the use of circumstantial evidence, utilizing the burden-shifting format first delineated in *McDonnell Douglas*. A presumption that the defendant unlawfully discriminated against the plaintiff is the result of having established the *prima facie* case. *Burdine*, 450 U.S. at 254. In order to establish the *prima facie* case of discrimination, a plaintiff is required to prove the following elements: (1) she was a member of a protected class; (2) she suffered adverse employment action; and (3) the action took place in circumstances which give rise to an inference of discrimination. *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005); *Moore-Stovall v. Shinseki*, 969 F.Supp.2d 1309, 1321-1322 (D. Kan. 2013). The burden to prove a prima facie case is "slight." *Tabor v. Hilti*, 703 F.3d 1206, 1216 n.4 (10th Cir. 2013).

If the plaintiff satisfies the initial burden of establishing a *prima facie* case, then the burden shifts from the plaintiff to the defendant to articulate a legitimate, nondiscriminatory reason for the employee's termination. *McDonnell Douglas*, 411 U.S. at 802; *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992). If the defendant meets its burden, plaintiff must then show a genuine issue of material fact whether defendant's stated reason is pretextual. *Moore-Stovall*, 969 F.Supp.2d at 1321. A plaintiff can present many forms of evidence to establish that defendant's stated reasons are pretextual. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). For example, a plaintiff can show pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1242 (10th Cir. 2002).

**Direct Evidence of Discrimination**

Emori acknowledges that her claims based on sex, race and religion are based on indirect evidence and will address them in more detail below; however, Emori does believe that there is direct evidence of discrimination in connection with her pregnancy claim. As set forth above, Emori has corroborating evidence that on multiple occasions Saleh said she should "get rid" of the baby or that it would be better for his family if she did so. These statements demonstrate discriminatory animus and are more than stray remarks. Clearly, Saleh was displeased that his brother-in-law had fathered a child with a non-Muslim, Christian woman and considered it an embarrassment or a problem for his family. Under these facts, Emori submits that Saleh's comments constitute direct evidence of discrimination against her based on her pregnancy.

**Indirect Evidence of Discrimination**

Emori asserts that she has sufficient indirect evidence of discrimination based on sex, race, religion and/or pregnancy to avoid summary judgment under the *McDonnell-Douglas* burden shifting analysis.

First, Emori can show a prima facie case of discrimination. We believe it is uncontroverted that she falls within a protected class based on her sex (female), race (white non-Arab), religion (Christian) and pregnancy. In addition, it is uncontroverted that she suffered adverse employment action in that she was terminated and had her hours reduced prior to her termination. Finally, Emori has submitted substantial evidence showing an inference of discrimination based on one or more of the protected classes set forth above, including but not limited to the following:

1. Saleh is an Arab, Muslim male, while Emori is a white, Christian female.

2. Corroborated testimony that Saleh expressed on multiple occasions Emori should "get rid" of her baby and/or that the pregnancy was bad for his family;

3. Corroborated testimony that Saleh treated women in the workplace differently than their male co-workers, including his tone, demeanor and discipline, including Saleh's references to Emori as a "crazy bitch";

4. Corroborated testimony that while Fares was the one throwing things at Emori and starting confrontations in the workplace, Emori was the one sent home, had her schedule reduced and no such action was taken against Fares;

5. Abusive and appalling behavior by males, especially Fares, toward females was rampant, including inappropriate sexual comments, demeaning names such as "cunt", throwing ice and batter at females and even threatening to put one female in a coma.

These actions were reported to Saleh on multiple occasions with not action taken by him;

6. The only documented disciplinary action taken against Emori occurred shortly before her termination;

7. Hailey Wright, an assistant manager, states that she was specifically told by Saleh that he could not put Emori on the schedule, which she assumed was due to the relationship between Emori and Fares;

8. Randie Schlichting indicates that Saleh appeared to have strong cultural beliefs about women;

9. IHOP's own evidence reveals inferences of discrimination. For example, in its statement of fact Paragraph 102, Emori was very clearly complaining that she needs the overnight shifts she previously worked, even before Fares started working there. In addition, she questions why she is sent home while Fares is allowed to stay. Finally, and most telling, Emori asks twice if Saleh's actions toward her were based on her "race, religion, culture, or the fact [she is] pregnant. There is no indication that Saleh disputed Emori's allegations or responded at all. It is very unusual for someone to be falsely accused of discrimination and not respond or deny the accusations;

10. In IHOP's Paragraph 87, Saleh accuses Emori of attempting to "bate" him merely because she expresses a willingness to convert to Islam. If he considered that comment to be "bating" then he was apparently hostile to the idea of Emori converting to Islam and becoming a member of his family. The obvious inference is that he did not want his brother-in-law marrying a non-Arab, Christian woman, even if she converted her faith.

The next step in the inquiry is whether IHOP has provided evidence of a legitimate, non-discriminatory reason for the reduction in Emori's hours and her termination. Although Emori disputes the allegations as a factual matter, she does not contest that IHOP has provided sufficient evidence to meet its burden under this aspect of the *McDonnell-Douglas* analysis. Accordingly, the remaining issue is whether there is evidence of pretext.

As set forth above, Emori can show pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Townsend, supra*, 294 F.3d at 1242. Under the facts of this case, there are substantial reasons to disbelieve Saleh's proffered reason for his actions against Emori. First, nearly all of the relevant evidence in support of IHOP's motion is controverted. For example, IHOP goes to great lengths to describe Saleh as a fair, non-discriminatory employer; however, Emori has submitted corroborated testimony indicating that this portrayal is far off the mark. In fact, the evidence suggests that Saleh was extremely chauvinistic and discriminatory toward female employees. His repeated references to Emori as a "crazy bitch" do no align with the image IHOP attempts to present. Second, the only formal writeup received by Emori was received shortly before her termination and after Saleh had learned of her pregnancy. Moreover, there is evidence in this case indicating that Emori's alleged attendance issues were not out of line with her co-workers. It is also telling that IHOP attempts to use inadmissible and irrelevant evidence regarding Emori's DUI arrests and conversations occurring six months after her termination to justify Saleh's decision to change her shifts and end her employment. In summary, IHOP's attempt to try this case through a battle of affidavits is contrary to the spirit and purpose of the summary judgment rule and should be disallowed.

**Response to IHOP's Specific Arguments**

1.    Legitimate Reason for Termination

IHOP's first argument in support of its motion is that it had a legitimate, non-discriminatory reason for reducing Emori's hours and terminating her employment.  As set forth above, Emori concedes that IHOP has presented such evidence for purposes of the *McDonnell-Douglas* analys; however, IHOP must still show that there is no evidence of pretext in order to succeed on its motion.  Because there is more than adequate evidence of pretext, the motion should still be denied.

2.    Failure to Show a Prima Facie Case

IHOP next attempts to defeat Emori's prima facie case.  This issue was addressed above and Emori submits that there is more than adequate evidence to show a prima facie case. Nevertheless, Emori will address each of IHOP's arguments on this point.

First, IHOP argues that at best Emori's evidence merely shows favoritism, not discrimination.  In the cases cited by IHOP, however, it appears that the facts involved romantic relationships and did not involve, religious, ethnic or pregnancy related issues.  Moreover, Saleh specifically indicated a desire for Emori to "get rid" of the baby, which is clearly related to her pregnancy and gender.  Finally, there is other evidence showing Saleh's discriminatory behavior toward women in general.  The other problem with IHOP's argument is that it relies on its on "spin" on the facts.  For example, IHOP asserts that Emori "seduced" Fares into getting her pregnant.  The record is devoid of any evidence that Emori "seduced" Fares or was leading him to stay out all night.

Second, IHOP argues that Emori has no direct evidence of discrimination.  With the exception of her pregnancy claim, addressed above, Emori is not contending to have direct evidence of discrimination on her sex, religion or race claims.

Third, IHOP asserts that the alleged shift change was not an adverse action. This argument is based on disputed facts and IHOP's inaccurate characterization of the issue. As set forth in the response to IHOP's factual contentions, the issue was not the hours worked per se; rather, the issue was the specific shifts worked. Emori contends that Saleh limited her to the slower, less profitable shifts while Emori had worked many of the busy, overnight shifts prior to her relationship with Fares. In addition, Saleh interfered with her attempts to pick up additional shifts and hours when she had an opportunity to do so. Through these actions, Saleh impacted Emori's income and therefore constituted adverse action for purposes of Title VII.

Fourth, IHOP claims that it cannot be construed as the unusual employer who discriminates against the majority. In support of this argument, IHOP cites two cases from the Tenth Circuit. Those cases are inapplicable, however, and involve claims of reverse discrimination. As noted by the Court in those case, same-group discrimination must be analyzed differently. In any event, the case at bar does not involve reverse discrimination or same-group discrimination. Quite the contrary, Saleh and Emori have different sexes, religions and races. Therefore, this argument is completely inapplicable and should be disregarded.

Fifth, IHOP argues that Emori was not treated differently than similarly situated employees of a different class. There are a number of shortcomings with IHOP's argument on this point. Once again, IHOP's entire argument is based on controverted facts, including the behaviors of Emori, Fares and Saleh. IHOP is asking the Court to assume the truth and accuracy of its affidavits in contrast to the affidavits submitted by Emori. In addition, this argument is based on an erroneous legal standard. As set forth above, disparate treatment is not a necessary element of a prima facie case or pretext; rather, Emori need only show that she suffered an adverse action under facts that infer discrimination. Finally, and most importantly, the facts do demonstrate disparate

treatment, including affidavits from other female co-workers who confirm the disparate treatment between men and women working under Saleh. This disparate treatment includes the difference in the way Emori was disciplined for allegedly fighting at work and how Fares was disciplined. Ultimately, Emori's hours were reduced and she was terminated. In summary, this argument is flawed both legally and factually and should be disregarded.

Sixth, IHOP asserts that Emori is not a victim of retaliation. Emori is not asserting a retaliation claim in this case as indicated in the Pretrial Order. Accordingly, no more attention will be given to this point.

3.   Unclean Hands Argument

IHOP's next argument is that Emori should be precluded from pursuing her claim because of unclean hands. Emori would first note that IHOP did not list unclean hands as an affirmative defense in the Pretrial Order and pursuant to its terms IHOP is precluded from raising defenses not contained therein. Second, the application of unclean hands to disputed facts is a question for the jury, not a question to be determined on summary judgment. *See Old Colony Ventures I v. SMWNPF Holdings*, 968 F. Supp. 1422, 1429 (D. Kan. 1997). Finally, to the extent that IHOP is attempting to invoke the *Ellerth-Faragher* analysis, its argument is misplaced, as that doctrine only applies to harassment that does not constitute tangible employment action, such firing and reassignment. *See Burlington Industries, Inc. v. Ellerth,* 524 U.s. 742 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998). In the case, Emori's case is based on tangible employment action, including the alteration of her work schedule and ultimate termination. Finally, the evidence is very clear that making complaints was futile and no action would be taken. Emori and three other women indicate that many complaints were made to Saleh and no action was ever taken.

23

4.    <u>Attorney Fees</u>

IHOP claims that it is entitled to attorney fees in spite of the substantial evidence regarding Saleh's wrongful and illegal behavior.  The facts of this case in no way support such a claim and IHOP's request should be denied.

**<u>CONCLUSION</u>**

For the foregoing reasons, Emori respectfully submits that IHOP's Motion for Summary Judgment and attempt to engage in a "battle of affidavits" should be denied and the case should be submitted to the trier of fact.

RESPECTFULLY SUBMITTED,


/s/ Larry G. Michel
Larry G. Michel  #01467
KENNEDY BERKLEY YARNEVICH
& WILLIAMSON, CHARTERED
119 West Iron Avenue, 7th Floor
P.O. Box 2567
Salina, Kansas 67402-2567
(785) 825-4674
lmichel@kenberk.com
ATTORNEYS FOR PLAINTIFF

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that she electronically filed the forgoing Memorandum Brief in Opposition to Defendant's Motion for Summary Judgment with the Clerk of the Court by using the CM/ECF System, which will send a notice of electronic filing to the following:

Joseph H. Cassell
David Prelle Eron
ERON LAW, P.A.
229 E. William, Suite 100
Wichita, KS 67202
(316) 262-5500
Fax: (316) 262-5559
jhcassell@eronlaw.net
david@eronlaw.net

on this 21st day of March, 2019.

/s/ Larry G. Michel
Larry G. Michel