IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


EMORI DODSON,

        Plaintiff,

    v.                                     No. 18-4034-SAC

FLYING DOVE, INC.
d/b/a IHOP #2045,

        Defendant.


MEMORANDUM AND ORDER

        The plaintiff Emori Dodson brings this Title VII action claiming the defendant employer unlawfully reduced her hours as a food server and then terminated her employment on account of her pregnancy, race, gender, and/or religion. The defendant is the franchised operator of the IHOP restaurant in Hays, Kansas, which hired Ms. Dodson in July of 2015 and terminated her in November of 2017. Ms. Dodson believes her hours were reduced and she was terminated because she was a white, non-Muslim woman who was pregnant from a relationship with Mr. Abass Fares, a cook at the restaurant and the brother-in-law of the restaurant's manager, Mr. Adham Saleh. Both Mr. Fares and Mr. Saleh are Arab Muslims. The defendant moves for summary judgment arguing that the plaintiff's evidence of race and religion discrimination is insufficient to state a prima face case and that the plaintiff's evidence of alleged discrimination on any ground is

1

insufficient to allow the jury to disbelieve the defendant's reasons for first changing the plaintiff's shifts and later terminating her.

**SUMMARY JUDGMENT STANDARDS**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding the motion, the court's role is "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The court may grant summary judgment for lack of a genuine issue when the evidence is insufficient "for a jury to return a verdict," when "the evidence is merely colorable," or when the evidence "is not significantly probative." *Id.* It follows then that a genuine issue for trial exists when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden is met "by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's

claim." *Adler*, 144 F.3d at 671. The burden then shifts to the nonmovant to "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational fact finder could find for the nonmovant." *Id.* (internal quotation marks and citations omitted). Such facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

The court applies this standard drawing all inferences arising from the record in the nonmovant's favor. *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003). The court does not make credibility determinations or weigh the evidence; these are jury functions. *Id.* at 1216. The Tenth Circuit has counseled this for summary judgment proceedings in employment discrimination cases:

> [I]n the context of employment discrimination, "[i]t is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini trial' to determine the defendant's true state of mind." *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995). Many of the highly fact-sensitive determinations involved in these cases "are best left for trial and are within the province of the jury." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he inquiry [at summary judgment is] whether the evidence presents a sufficient disagreement to require submission to a jury...."). Consequently, "in this Circuit . . . an employment discrimination suit will always go to the jury so long as the evidence is sufficient to allow the jury to disbelieve the employer's [explanation for the alleged misconduct]." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1177 (10th Cir. 1998) (Tacha, J., concurring in part); *see Randle*, 69 F.3d at 452 ("[I]f . . . inferential evidence is sufficient to allow a plaintiff to prevail at trial, it is surely sufficient to permit a plaintiff to avoid summary judgment so that the plaintiff can get to trial.").

*Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1220-21 (10th Cir. 2015).

**FACTS**

The court regards the following facts to be uncontroverted for purposes of this order and have been viewed in the light most favorable to the plaintiff.

The plaintiff Emori Dodson ("Dodson") describes herself as a 23-year old white Christian woman living in Hays, Kansas. She worked at the Hays IHOP restaurant and was first hired on July 16, 2015. The restaurant's manager since June of 2014 has been Adham Saleh ("Saleh"), and his brother-in-law, Abass Fares ("Fares" or "Dave") worked as a restaurant cook. Fares lived with Saleh between July and November of 2017, and he began dating Dodson in August of 2017.

When hired, Dodson signed a form acknowledging receipt of a copy of the Employee Handbook which included rules on calling in when sick and on speaking with the manager on duty when late to work. The rules warned, "IF you do not call or have a no call no show you will be written up, 3 write ups results in termination." ECF# 35-8, p. 2. Dodson digitally signed the employee handbook on February 12, 2016.

The restaurant never employed Dodson full-time, and her employment occurred over three separated periods:

| Period | Dates | Average Hours |
|--------|-------|---------------|
| First | 7/19/15—7/31/16 | 16.9 hrs/wk |
| Second | 1/2/17—5/21/17 | 7.0 hrs/wk |
| Third | 7/2/17—12/3/17 | 20.3 hrs/wk |

The second highest number of hours that the plaintiff ever worked at IHOP during an 8-week period occurred from 8/14/17—10/8/17, when she averaged 35.2 hrs/wk. The scheduling of Dodson's shifts was not consistent, except for the last few weeks of her employment in 2017 when she worked exclusively the day shifts on Saturdays and Sundays. Dodson preferred working shifts with the best potential for earning tips which she regarded as the evenings and nights on weekends.

Text messages between Dodson and Saleh show that the plaintiff was late to work on August 13, 17, 20, and 21, and that this upset Saleh. The plaintiff asserts she "was occasionally tardy or missed work" but that she "did not have any more issues than many of the other employees." ECF# 36-1, ¶ 4. The court sustains the defendant's objections for lack of foundation and supporting evidence to Dodson's averment and also to the statement in Liles' affidavit that Dodson "always showed up for her shifts," (ECF# 36-2, p. 1). ECF# 37, p. 2. Both affidavits lack a foundation for personal knowledge. With Dodson, there is nothing to show how she would be competent to compare her attendance issues with those of all other employees. Other than stating her opinion, Dodson's affidavit provides no supporting details about other employees' attendance issues. Liles' affidavit fails to establish a time frame when she worked with Dodson as to opine that she "always showed up for her shifts." Even assuming the dates in Liles' affidavit should be corrected to 2017, the uncontroverted text messages

exchanged between Saleh and Dodson plainly contradict Liles' statement and leaves its support and scope in doubt.

Shortly after starting her third period of employment, Dodson and Fares began having a sexual relationship, and Dodson made it public knowledge at the restaurant. Saleh observed that Dodson was "a major cause of workplace stress for other employees." ECF# 35-1, p. 3. Employees told Saleh "that they felt that Dodson was 'crazy' or 'psycho.'" *Id.* While the plaintiff avers she was a "good employee" and "did not cause any disruptions at work," she is unable to controvert what other employees may have told Saleh. ECF# 36-1, p. 2.

On August 8, Dodson texted Saleh at 10:52 pm asking if she could work the next Thursday. ECF# 35-12, p. 3. Saleh said he would get back with her and then asked how she was doing. *Id.* During this exchange, Dodson told Saleh that she was now a certified med aide and Saleh congratulated her. *Id.* Saleh then wrote that Dodson, "You are a hard worker. But crazy sometimes." *Id.* Dodson responded, "I have to work hard now so i don't have to later. And only the best people are." *Id.*

On August 29, Dodson texted Saleh asking why he had told Fares "not to hang out" with Dodson. ECF# 35-12, p. 18. Saleh responded:

> I like u and u already know that and I'm always trying to help u out and always wanna see u doing good in your life and u were but I can't be involved between u and Dave but I'm so sure he was so sad to see u in the jail and was so worried about u and what will happen to u, and he is mean to u that's mean he do care about u and he wants the best for u.

ECF# 35-12, p. 18. This text evidences Saleh's knowledge of Dodson's arrest

on August 28, 2017. Fares and Liles were passengers in Dodson's car when

she was stopped and arrested for driving under the influence. A search of

her vehicle yielded drugs and drug paraphernalia. Saleh avers that after

Dodson's arrest, he "became increasingly worried about how Dodson's illicit

drug activity was affecting her work as well as my home life." ECF# 35-1, p.

3. Dodson's objections to evidence of this arrest as irrelevant and

inadmissible are overruled, as the evidence is relevant insofar as Saleh has

testified he knew of the arrest which created concerns for him over the

plaintiff's behavior and its impact on her employment and his home life.

 The next morning, August 30, Saleh started a text exchange

during which Dodson threatened to kill herself and expressed concerns over

the possibility of her termination. Saleh asked to have coffee with her, and

the following was exchanged:

> Saleh: Nothing deserve killing yourself for it.  Take care.
> Dodson: No. I know. But youre just going to fire me.
> Saleh: I don't think like that. Silly.
> Dodson: Is ihop have to close.
> Dodson: Feeling so happy and so sad at the same time, one would think it's a gift.
> Saleh: Emori u are a very nice person so don't belittle yourself and it's time to keep focusing to make yourself better and we don't want to give up for any reason.

ECF# 35-12, p. 20.

 Saleh warned Dodson in person and through text messages to

keep her personal life with Fares out of the restaurant and not to bring their

personal drama to work. Around 6 pm on September 3, Dodson texted Saleh that she could "take a hint" and would "start job hunting." ECF# 35-12, p. 21. Saleh responded with this warning:

> Yes, you are a very good server and I don't want to loose you for some silly things but I prefer you to be more careful about your relation and how if it will be at work with no control then it will be a problem, Fatima and I were so careful for that and it should be like that. Just keep it out side your work zone Have a good night.

*Id.* Later that same evening, Dodson began exchanging text messages:

> Dodson:    U know there was no drama or anything bad until u said something. Daniel and josh had more crap going on than we have at all. We came in happy and now its done. Weird I thought itd be one of us to break my heart. Out of all my chaos going on there was one thing keeping me smiling. But now no,
> Dodson:    White girls are crazy. Will u ever learn lol.
> Saleh:      Now I know
> Dodson:    Good.
> Dodson:    And stop messin w our hearts
> Saleh:      Haha
> Saleh:      That's meanie
> Dodson:    I just wanna be loved for the psycho nice lady that I am.

ECF# 35-12, pp. 22-23. At 12:18 am on September 5, Dodson texted Saleh telling him to instruct Fares to be at the restaurant at 4:30 am, or "ihop blows lol jk." *Id.* at p. 25. Her last text at 1:09 am reads, "I apologize. Thank you for all you do. Youre the best boss ever. Ill take good care of ihop tonight. Lol." *Id.*

Two days later, September 7, Dodson texts Saleh asking him to tell Fares to respond to her calls. The following texts were exchanged:

> Saleh:      Text him, I am working right now. you guys need to figure things out. I can't be in between your relationship.

> Dodson:     I have been messaging him. He reads them and not
> answer.
> Saleh:      Emori, u need to calm down and don't worry about his
> stuff and it's not good now to talk about anything cause both of u are
> crazy, and really I'm sorry I can't be involved that much between bot
> of u.
> . . . .
> Dodson:     That's what happens when he leaves shit in my car like its
> his own.
> Dodson:     Its mine now.
> Dodson:     Oh and im not done
> Dodson:     And he shouldn't me scared. Its just me
> Dodson:     If I don't hear from him before tomorrow he will regret it
> and he will feel the guilt for the rest of his life.

ECF# 35-12, pp. 28-29.

On September 12, Dodson left work at 10:23 pm. Between 11

pm and 2 am, Dodson began banging on Saleh's door at his home. Saleh

answered the door and observed that Dodson appeared to be under the

influence of intoxicants. She was crying that she wanted Fares because they

had a falling out. Fares was hiding in Saleh's home and did not come out.

The situation apparently disturbed a neighbor who called the police, but

Dodson left before the police arrived. Saleh decided to fire Dodson after this

incident.

On the afternoon of September 14, Dodson started texting

Saleh:

> Dodson:     So, even though I come ur house to get a housekey back
> from dave, u call the cops, and u then fired me for outside of work
> relationships and or issue. Do u want me to file for unemployment?
> You took this way too far. And way too personal. Afterall, im bruised
> all over and dave a worldwide . . . So what?
> Saleh:      First of all I didn't call the cops for u cause I'm not that
> person and second I told you many times I'm trying to take care of u

as much as I can and I believe u know that, but I didn't like what happened yesterday knocking on my door overnight acting like that with blaming me about your relation with Dave and I already told you I don't wanna be involved on this and I believe I helped the last time and I was trying to be nice for both of u and Emori I'm really sorry for what's going on between u and Dave and I prefer to let you go cause it's also effecting in the restaurant too so it's up to you and u can do whatever you feel it's right and I wish you all the luck.

Dodson:     U cant fire me for outside of work relationships

Dodson:     Its not affecting the work environment.

Dodson:     How has it affected the workplace?

Dodson:     We didn't fight at work and I stay in the front.

Dodson:     If it was any other guy u wouldn't have known about it u only knew bc u 'lived with him'

Dodson:     If it was anyone else, u would have had NO idea. So how is this not personal?

Dodson:     Its actually not affecting the workplace. And you can have a lawsuit for that.

Dodson:     I am professional at work

Saleh:      I know what's better for work and I'm hearing everyone talking about that and its not right so as a manager I can do that and I'm sorry I still like u as a friend tho

ECF# 35-12, pp. 31-32. Despite Dodson's behavior, Saleh reversed his decision and allowed her to return to work on September 15. He did this because he and his wife socialized with Dodson and his decision to fire Dodson complicated things for Saleh's family. Saleh also worried about Dodson's escalating instability and how it would affect his home life if he did not let Dodson return to work.

On September 23, Dodson texted Saleh a photo of a positive pregnancy test and urged Saleh to tell no one about this for now. ECF# 35-12, p. 37. Saleh texted back, "Emori, I won't tell anyone but Dave needs to know so u can call or text him, guys it's your own personal life so please try to figure something out of IHOP cause its not good to show our life outside

the work inside the work and wish the best for both of you." *Id.* at 38. Dodson texted back that Dave knew already. *Id.*

The text messages exchanged over the next two weeks between Saleh and Dodson confirm that Dodson was late for a shift, asked for shift to be rescheduled, left her shift early without cleaning her area, and missed a shift. ECF# 35-12, pp. 38-46. After missing the shift, Dodson's hours declined. Besides what appears in the text messages, Saleh avers that he confronted Dodson about her tardiness, absenteeism, habitual disregard of the work schedule, and fighting with Fares at work. Saleh's practice was to use written warnings infrequently. But at the urging of his night manager, Ashley Ayarza, he issued a written warning to Dodson on October 13, 2017. Dodson signed the written warning which stated the following reasons for the warning: "No call No show No job. Not the first time, not following directions as she should be, also not the first time." ECF# 35-16. The warning spelled out that Dodson's failure to take the corrective action of being timely and respectful would result in her termination. *Id.* The plaintiff's summary judgment response does not effectively controvert any of the facts stated in this paragraph.

Just hours after receiving this written warning, Dodson and Fares fought at work and threw things at each other. Saleh decided he could no longer schedule Dodson on any shifts other than the weekend day shifts, as he believed she had become dangerous to herself and to others when she

was around Fares who worked evenings during the week and weekends. Saleh also decided to hold Dodson strictly to her scheduled time shifts. In response to Saleh's announced decision, Dodson sent profanity-laced text messages to Saleh. She told Saleh to change Dave's shifts not hers, because she made more money during those shifts and she was a better employee than Dave. ECF# 35-12, pp. 47-48. Later in this string of texts, Dodson then suggested Saleh's decision to change her shift may be related to her "race, religion, culture, or the fact of" her pregnancy. *Id.* at 48. Dodson texted that she was coming to the restaurant and wanted permission to "clock in," but Saleh denied permission. *Id.* She texted threatening to come to the restaurant if Saleh did not talk with her. *Id.* Dodson followed this with a text complaining that Saleh did not send Dave home too and accusing Saleh, "so its sexist, religion and the fact im pregnant." *Id.* While Saleh was also concerned by Fares' behavior at work, he kept Fares on his regularly scheduled shifts because he believed Dodson was instigating the fighting, because changing Fares' shifts would have caused Saleh more problems, because Fares was the more reliable employee, because "IHOP was constantly short of cooks," and because IHOP would have had to hire more cooks to cover a shift change for Fares while it had enough servers to cover Dodson's shift change. ECF# 35-1, p. 5.

Saleh was becoming increasingly nervous about Dodson's escalating behavior and "about having any dealings with Dodson of any

nature." ECF# 35-1, p. 6. On October 18th, when Dodson texted Saleh about helping her terminate the joint phone contact with Fares, Saleh responded:  "Call the cops and the can walk with you cause I don't want to be involve with all this and tomorrow you'll your phone and please don't text me back or I'll call the cops just u can text about your job here." *Id.* at p. 49.

On October 25, Dodson filed her complaint with the EEOC alleging IHOP had discriminated against her based on her race, sex, religion, and pregnancy. ECF# 35-18. The complaint alleges that Saleh learned of her pregnancy in late September and began discriminating against her by cutting her hours from 35 to 16 hours per week, by issuing a written warning that was her "very first disciplinary action . . . ever received while employed at IHOP," and by not stopping Fares from throwing things at her in the restaurant. *Id.*

On November 8 and 9, Dodson texted Saleh asking if he would reschedule her from Sunday morning to Friday, as she wanted to work at her other job. Saleh wrote back that he would check, but the next day there was this exchange:

> Saleh:      Let me Let me tell you this, u are on the schedule for Sat and Sun so you need to cover those days and next week if you prefer to work in the other job I don't mind to
> Dodson:      Ok
> Dodson:      So if I work St or Sun day at the other store u will need to schedule me evenings so I am on the schedule at all.
> Saleh:      No I won't cause I have too many
> Saleh:      Sorry

> Dodson:     Not my problem.
> Saleh:      Behave
> Dodson:     U cannot not schedule me if I told y'all I can only do eveningsanwayh upon hire bc of school.
> Dodson:     U took my nights away and so I need them back
> Dodson:     Ucvan do that u just don't and that is the problem here
> Dodson:     But up to you. You're leaving me no choice but to do whatg I am doing
> Dodson:     Keep it up
> Dodson:     You're purposely not leaving room for me on your schedule and that's wrong considering I use be all over that schedule. it's not my fault u hire any trash that walks through that door.
> Saleh:      Don't text or call me again, cause I don't like the way how u talk so if you need anything u can call only the store
> Dodson:     Is that your only valid reason? THat you don't like the way I talk?
> Dodson:     Doesn't matter if I call the store. You won't be there.
> Dodson:     See u Saturday and Sunday. Thanks for all the help.

ECF# 35-12, pp. 51-52. Dodson later asked Saleh about having another person cover her shift, and Saleh denied the request. Dodson was asking for a schedule change to work for IHOP's main competitor and to determine whether she liked working there better.

On November 26, Dodson texted Saleh that she was not coming in as she was sick and needed rest. At 11:31 p.m. on November 29, Dodson texted Saleh: "I'm knocking on ur door one more time." ECF# 35-12, p. 55. She then texted at 12:26 a.m. on November 30, "You're next." *Id.* Saleh avers that Dodson had been at his home banging on his doors, but Dodson denies this. At 8:46 am on November 30, the following text exchanges occurred:

> Dodson:     I will bring u all up in our business unlessu get dave to call me or answer ur door.
> Dodson:     I'm headed to the store now. U have a key?

14

Dodson:     Yes, I'm crazy we had gone over this. If he told me hey I need a break I wouldn't be so mad now would I but instead to told me nothing and we home w u and won't answer me. Tell him congrats that his baby can die of stress if that's what he's trying to do.

Dodson:     Communicate!! That's all he needs to do. Sorry to bother u

Saleh:     Thank you for working with me but you're not allowed to work with me anymore cause it's enough Good luck with your adventure.

Saleh:     You're fired.

Dodson:     Why am I fired

Dodson:     Is it retaliation.

Dodson:     Bc it's very unprofessional to fire me through a text.

Dodson:     And I will take IHOP with me

Dodson:     Good luck to you actually

Dodson:     I was planning on keeping the peace for Dave's sake but I'm over it.

Dodson:     Is this something u and dave decided last night.

Dodson:     So since ur not my boss anymore I can text u forever right lol

Dodson:     Oh good.

Dodson:     Ur going to enjoy me a lot better as an employee than not.

Dodson:     I will make sure of that

Dodson:     And when I say I'm taking it down w me I mean it. Good luck. Uve already ruined that store enough. U know what u and a cockroach have in common?

Dodson:     You're both a disgusting waste of life. Enjoy the ride.

*Id.* at pp. 55-56. Saleh then called the Hays police about Dodson's behavior. The police officer contacted Dodson, and "she admitted she was going to Saleh's residence and calling and texting him due to her trying to get ahold of Fares who is the father of her child." ECF# 35-15, p. 80. The officer told Dodson that she was no longer allowed to have contact with Saleh in person or by telephone and that she was not allowed at his residence or on IHOP property. *Id.* Saleh also asked Fares to move out of his residence when he fired Dodson.

Saleh did not learn of Dodson's EEOC complaint until after these events and after the new year. Between May 3 and June 17, 2018, during the pendency of this case, Dodson texted Saleh on several occasions, with the first text on May 3rd saying, "For the record this is family related only: In the end with all this mess, you have yourself to thank." ECF# 35-12, p. 57. She also texted photos of her child. *Id*. at pp. 59-61.

Most employees at the IHOP restaurant have been Christian. While this restaurant has been managed by Saleh, less than ten Arabs have worked there, and most employees have been non-Arab.

**GOVERNING LAW**

Under Title VII, it is unlawful "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The terms 'because of sex' . . . include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medicated conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, . . . ." 42 U.S.C. § 2000e(k).

"To survive summary judgment on a Title VII claim of discrimination based on race, color, religion, sex, or national origin, a plaintiff must present either direct evidence of discrimination or indirect

evidence that satisfies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019). "Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 883 (10th Cir. 2018) (internal quotation marks and citation omitted). "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (internal quotation marks and citation omitted). "Comments . . . that reflect personal bias do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decisionmaking authority and acted on his or her discriminatory beliefs." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013).

"Under the *McDonnell Douglas* framework, a plaintiff must first raise a genuine issue of material fact on each element of the prima facie case, as modified to relate to differing factual situations." *Bekkem*, 915 F.3d at 1267 (internal quotation marks and citation omitted). "The burden then shifts to the employer to offer a legitimate nondiscriminatory reason for its employment decision." *Id.* "If the employer does so, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.* At this last stage, the court is to

"consider the evidence of pretext in its totality." *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d at 884.

The Tenth Circuit has counseled:

> Importantly, in the context of employment discrimination, "[i]t is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini trial' to determine the defendant's true state of mind." *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995). Many of the highly fact-sensitive determinations involved in these cases "are best left for trial and are within the province of the jury." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he inquiry [at summary judgment is] whether the evidence presents a sufficient disagreement to require submission to a jury...."). Consequently, "in this Circuit ... an employment discrimination suit will always go to the jury so long as the evidence is sufficient to allow the jury to disbelieve the employer's [explanation for the alleged misconduct]." *Beaird v. Seagate Tech.*, Inc., 145 F.3d 1159, 1177 (10th Cir.1998) (Tacha, J., concurring in part); *see Randle*, 69 F.3d at 452 ("[I]f ... inferential evidence is sufficient to allow a plaintiff to prevail at trial, it is surely sufficient to permit a plaintiff to avoid summary judgment so that the plaintiff can get to trial.").

*Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1220–21 (10th Cir. 2015).

## ANALYSIS

### Battle of Affidavits

The plaintiff is critical of this summary judgment proceeding as constituting a battle of affidavits, because the defendants did not depose her or any of the critical witnesses in this case. The plaintiff believes the defendant's efforts are to try the case on affidavits "contrary to the spirit and purpose of the summary judgment rule and should be disallowed." ECF# 36, p. 20. The plaintiff cites *DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 844 F.2d 714, 719 (10th Cir. 1988), in support of her position. The

Tenth Circuit there used "battle of affidavits" in deciding an interlocutory appeal from the denial of a qualified immunity defense: "Our task in such an appeal is not to determine liability on a battle of affidavits, but to determine whether, on the basis of the pretrial record, there exists a conflict sufficiently material to defendants' claim of immunity to require them to stand trial." *Id.* The Tenth Circuit's decision does not disparage bringing a summary judgment motion based on affidavits without depositions. The plaintiff also cites *Metropolitan Life Ins. Co. v. Browning*, 839 F. Supp. 1508, 1510 (W.D. Okla. 1993). This case is inapplicable as the defendant is not relying on affidavits to contradict prior deposition testimony.

Dodson makes no challenge to the defendant's good faith in using affidavits. In its summary judgment ruling, the court has looked carefully at the sufficiency and specificity of the affidavits offered by both sides. Summary judgment pleadings are properly supported by affidavits that are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The plaintiff does not submit an affidavit pursuant to Fed. R. Civ. P. 56(d), showing for specified reasons that she cannot present facts essential to opposing summary judgment and thereby justifying denial of the motion. It is proper under the circumstances to proceed with deciding the motion on the merits. *See Cerveny v. Aventis*, Inc., 855 F.3d 1091, 1110 (10th Cir. 2017). The

court denies the plaintiff's request to disallow the defendant from seeking summary judgment based on affidavits.

*Direct Evidence*

The plaintiff concedes her discrimination claims based on sex, race, and religion are subject to the *McDonnell Douglas* framework. She, however, believes that she has direct evidence of Saleh's discriminatory animus for pregnancy discrimination. She relies on evidence that Saleh suggested to her "on several occasions that I should 'get rid of the baby.'" ECF# 36-1, ¶ 9. Jessica Liles, a former server at IHOP, avers that Saleh commented that Dodson "needed to get rid of the baby because it would be easier on their family." ECF# 36-2, ¶. 3. The plaintiff also argues her observation of Saleh's general displeasure with her becoming pregnant by his brother-in-law. ECF# 36, p. 17. The plaintiff asserts that Saleh's comments and attitude constitute direct evidence of discrimination based on her pregnancy.

The Tenth Circuit in *Tabor* reiterated "the importance of context and temporal proximity in determining whether comments reflecting personal bias qualify as direct evidence of discrimination." 703 F.3d at 1217 (internal citation omitted). "[I]f the content and context of a statement allow it to be plausibly interpreted in two different ways—one discriminatory and the other benign—the statement does not qualify as direct evidence." *Id.* at 1216. The plaintiff fails to provide a context for Saleh's comments, and there

is nothing to show that Saleh was directing his comments to Dodson's work, her ability to work, or the conditions of her work. These comments do not prove "the fact of discriminatory termination without inference or presumption." *Canfield v. Off. of Sec. of State for the State of Kansas*, 209 F. Supp. 3d 1219, 1225 (D. Kan. 2016). As evidenced by the text messages, this case uniquely features extensive communications between Dodson and Saleh over personal matters unrelated to Dodson's employment. Dodson's opinion or conclusion that Saleh was displeased with her pregnancy is not direct evidence. "Statements of personal opinion, even when reflecting personal bias or prejudice, do not constitute direct evidence of discrimination, but at most, are only circumstantial evidence of discrimination because the trier of fact must infer discriminatory intent from such statements." *Clay v. United Parcel Serv., Inc.*, 2014 WL 5298173, at *5 (D. Kan. 2014), *aff'd*, 599 Fed. Appx. 334 (10th Cir. 2015). Without a context for Saleh's comments and without a basis for directly linking Saleh's comments and attitude to an employment decision, there is no direct evidence that "demonstrates on its face that the employment decision was reached for discriminatory reasons." *See Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002).

*Prima Facie Case*

The plaintiff bears the burden of making a prima facie case of discrimination which "must consist of evidence that (1) the victim belongs to

a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). The burden of making a prima facie case "is not onerous," "is one of production, not persuasion," and "involve[s] no credibility assessment." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (internal quotation marks and citations omitted). While the prima facie case serves primarily to eliminate "the most common nondiscriminatory reasons" for the adverse employment action, it still must function as a critical inquiry into "whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Plotke*, 405 F.3d at 1099-1100 (internal quotation marks and citations omitted). As relevant here, such circumstances may include: "actions or remarks by decisionmakers that could be viewed as reflecting a discriminatory animus," "preferential treatment given to employees outside the protected class," and "the timing or sequence of events leading to plaintiff's termination." *Id.* at 1101.

The defendant argues the plaintiff's alleged circumstances do not sustain an inference of unlawful discrimination. The circumstances do not point to discriminatory animus as much as they show that Saleh was upset with Dodson's behavior, did not want her dating his brother-in-law, and did not want her in his family. In short, a personal feud, animosity, or dislike of

another, and favoritism for your own relatives are not motives prohibited by Title VII. *See Platner v. Cash & Thomas Contractors, Inc.*, 908 F.2d 902, 905 (11th Cir. 1990). The defendant disputes an inference of discriminatory intent arising from Saleh's decision to change only Dodson's shift after the fighting between her and Fares. This evidence only shows, at most, that Saleh treated Fares, his brother-in-law who lived with him, better because of their family and personal relationship. "Neither in purpose nor in consequence can favoritism resulting from a personal relationship be equated to sex discrimination." *Preston v. Wisconsin Health Fund*, 397 F.3d 539, 541 (7th Cir. 2005) (citations omitted). The defendant also denies that Fares is similarly situated to Dodson, because Dodson engaged in other behavior including, attendance issues, harassing Fares at work when she was not scheduled to work, stalking Fares at Saleh's home, and sending disrespectful and profanity-laced text messages to Saleh. Another difference in their situations is that Fares worked full-time as a cook which was a position difficult to fill while Dodson was a part-time server.  The defendant also argues the plaintiff cannot show an adverse employment action from Saleh changing her shift to avoid having her and Fares on the same shift. Finally, the defendant contends the plaintiff's race and religion claims assert reverse discrimination, and she is unable to "establish background circumstances that support an inference that the defendant is one of those

unusual employers who discriminations against the majority." *Mattioda v. White*, 323 F.3d 1288, 1292 (10th Cir. 2003).

Looking first at the plaintiff's prima facie cases for her race and religion claims, the plaintiff summarily responds that because she is a white Christian and Saleh is an Arab Muslim, her claims do not assert reverse discrimination or same-group discrimination and no additional proof of background circumstances is necessary. The plaintiff cites no legal authority for her conclusion. When a plaintiff is a member of an historically favored group, the presumptions in Title VII analysis used when a plaintiff belongs to a disfavored group do not operate with the same justification. *See Notari v. Denver Water Dep't,* 971 F.2d 585, 589 (10th Cir. 1992). "[A] Title VII disparate treatment plaintiff who pursues a reverse discrimination claim and seeks to obtain the benefit of the *McDonnell Douglas* presumption, must, in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Id.* "Alternatively, a plaintiff may produce facts 'sufficient to support a reasonable inference that but for the plaintiff's status the challenged decision would not have occurred.'" *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006). Because the plaintiff is white and Christian, she must establish additional background circumstances to support the required inference. *See Rooney v. Rock-Tenn Converting*

*Company*, 200 F.Supp.3d 816, 820 (W.D. Ark. 2016) (Christian male alleging discrimination pointed to the structure of the company, the number of Jewish supervisors, and the preferential treatment of Jewish employees), *aff'd*, 878 F.3d 1111 (8th Cir. 2018). "It is insufficient, however, simply to show that the decision maker was a member of a minority group." *See Taken v. Oklahoma Corp. Com'n*, 934 F. Supp. 1294, 1298-99 (W.D. Okla. 1996) (The minority status of the decision maker is insufficient background circumstances noting that in *Notari* the Tenth Circuit found that the male plaintiff had failed to allege the necessary background circumstances even though his female superior had given the job to another female. 971 F.2d at 589), *aff'd*, 125 F.3d 1366 (10th Cir. 1997)("We need not address whether a white plaintiff is relieved of her obligation to show the requisite background circumstances where discrimination is perpetrated by members of a different race because, here, plaintiffs failed to show that the employment decision was made solely by non-whites.")); *Kenfield v. Colorado Dept. of Public Health & Environment*, 557 Fed. Appx 728 (10th Cir. Feb. 14, 2014) (The black supervisor's decision not to promote a white employee did not sustain a reasonable inference for a prima face case of race discrimination). The court looks to all the circumstances to determine if they rise to an inference of unlawful discrimination based on race or religion.

The court cannot find from the evidence offered by Dodson a reasonable inference that her religion or race was behind Saleh's decisions

to change her shift or to fire her. She has not presented a genuine issue of material fact on this element of the prima facie case. She has not come forward with evidence that Saleh generally discriminated against employees based on their Christian faith or race. There is the plaintiff's evidence that Saleh expressed disappointment over his brother-in-law Fares dating Dodson and over Dodson becoming pregnant with Fares' child. He also suggested to Dodson several times that she should "get rid of the baby." ECF# 36-1, p. 3. First, connecting Saleh's comments to Dodson's religion or race is more guesswork than inference. As the record shows, Saleh had several personal reasons for being concerned about and displeased with Dodson's relations with his family. Even assuming the comments are related to religion or race, Saleh's comments are still only connected to personal family concerns and have not been connected to his employment decisions as restaurant manager. The plaintiff's only evidence of disparate treatment is Saleh's different treatment of Fares for his fighting with Dodson at work. That Fares differs from Dodson as to race and religion is not enough to establish a prima facie case. The plaintiff's evidence simply fails to offer a reasonable basis for inferring that Saleh's decision to send Dodson home and change her shift was due to her religion or race. Dodson offers no circumstances that could justify a presumption of reverse race or religion discrimination. The evidence of record shows Saleh employed mostly Christians and non-

Arabs. The plaintiff has not carried her burden of making a prima facie case of reverse religion and race discrimination.

As for the plaintiff's discrimination claims based on pregnancy and sex, the court will assume the plaintiff has carried her prima facie burden. The plaintiff avers that after she became pregnant, Saleh cut her hours, moved her to shifts that were less desirable, issued a disciplinary warning that was her first, suggested she end her pregnancy, and sent her home when Fares was abusive toward her at work. The plaintiff and several other former employees of the restaurant have averred that there was "male favoritism" shown at work with harassment of women tolerated or ignored and with the female employee sent home whenever there was a dispute. Accepting at face value these averments, the court accepts that a genuine issue of material fact over the prima facie cases likely exists. The court declines to address the defendant's other challenges, because to do so would conflate the plaintiff's claim with the defendant's proffered explanations. *See Orr v. City of Albuqueque*, 417 F.3d 1144, 1149 (10th Cir. 2005). The court also accepts the plaintiff's argument that the shift change was an adverse employment action as it resulted in a monetary loss of tips. *See id.* at 1150 ("monetary losses take a variety of forms," including changes in compensation and benefits, and constitute an adverse employment action).

*PRETEXT*

The plaintiff concedes that the defendant has met its "exceedingly light" burden of articulating some legitimate, non-discriminatory reason for its challenged actions under *McDonnell Douglas. Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1165 (10th Cir. 2007) (en banc). The defendant puts forward Saleh's affidavit, co-employees' affidavits, and 68 pages of text messages between Dodson and Saleh to support its several reasons for changing her shift/hours and then terminating her. First, as evidenced in the text messages, Saleh had a personal relationship with Dodson and accordingly showed her concern and patience based on that relationship. Saleh's patience was sorely tested and finally broken by her repeated instances of inappropriate and egregious words and actions directed at him and Fares. Because Dodson's behavior was harassing, stalking, disturbing and menacing, and had become more threatening to his personal life and home, Saleh looking out for the personal welfare of himself and his family severed all ties with Dodson, terminated her employment, and involved the police in enforcing his decision. Second, Dodson frequently missed her shifts or arrived late to work. Third, Dodson violated other IHOP policies on fighting, drugs, intimidation, insubordination, disrespectful conduct, and holding outside employment having an adverse impact on her IHOP job. She brought the drama of her workplace romance to work despite warnings from Saleh. She sent to Saleh text messages that were disrespectful and laced with profanity and that demanded Saleh to

have Fares talk with her, threatened Saleh, and insisted Saleh change her work schedule.

It now falls to the plaintiff to show that the defendant's proffered reasons are pretextual, that is, are "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (internal quotation marks and citation omitted). The plaintiff may also produce "direct evidence discrediting the proffered rationale, or . . . [show] that the plaintiff was treated differently from others similarly situated." *Lounds v. Lincare, Inc.*, 812 F.3d at 1234 (quotation marks and citation omitted). "Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Bekkem v. Wilkie*, 915 F.3d at 1268 (internal quotation marks and citation omitted). "Evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other." *Wells v. Colorado Dept. of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003)(internal quotation marks and citation omitted). "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1169–70 (10th Cir. 2007) (quotations omitted). The inquiry does turn

on whether "a reasonable factfinder could rationally find [the employer's rationale] unworthy of credence and hence infer that the employer did not act for the asserted [non-retaliatory] reasons." *Crowe v. ADT Sec. Services, Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011) (citation omitted).

Dodson argues her evidence creates genuine issues of material fact for disbelieving Saleh's explanations given for changing her shift and then terminating her. She believes her affidavits effectively controvert much of IHOP's evidence and contradict the defendant's characterization of Saleh as a fair employer who does not discriminate. There are statements in those affidavits that Saleh displayed a chauvinistic and discriminatory attitude toward female employees. She mentions Saleh calling her a "crazy bitch." She points to the only written disciplinary warning she received after becoming pregnant. She stands on her opinion that her attendance issues "were not out of line with her co-workers." ECF# 36, p. 20. And finally, she points to Saleh's disparate treatment of her and Fares for workplace fighting.

This case is unusual for the pages of uncontroverted text messages. They overwhelmingly evidence Saleh's primary reason for his adverse employment actions such that no reasonable factfinder could rationally find his reason to be unworthy of credence. Dodson's personal relationships had so intertwined with her employment as to negatively impact Saleh's personal life and his ability to manage her and his restaurant. The text messages evidence that Saleh believed he could no longer deal with

Dodson and severed all relationships with Dodson. The only references in these text messages to Dodson's race, religion, sex, or pregnancy come from Dodson trying to make them an issue. The text messages consistently establish that Saleh had become concerned with Dodson's behavior in these personal relationships. Behavior that had become so increasingly disruptive and threatening not only to the workplace but to his own personal life that Saleh had enough and ended his involvement with Dodson, personally and professionally. Dodson does not effectively controvert what the text messages reveal as to her egregious behavior toward Saleh and Fares and as to her work place conduct and issues with attendance and attitude. Dodson's affidavit includes a general denial about her work place conduct, but it is plainly contradicted by her text messages which specifically evidence her problems with attitude and attendance and even include her own admissions about throwing things and being difficult and appreciating Saleh's patience with her.

The defendant correctly argues that Saleh's "crazy bitch" comment when placed in the context of this case does not create a genuine issue of material fact over pretext. According to Liles' affidavit, Saleh made this comment in this context:

> On November 2, 2018, I came into work and was called into Adham's [Saleh's] office. Adham told me that Emori is 'crazy' and that he cannot do it anymore. He told me that she needed to get rid of the baby because all she does is fight with Dave. He asked that I tell Emori that she was off the schedule until further notice and to tell her he

> would call her to let her know when and if she could work. He then
> proceeded to tell me that Emori was a "crazy bitch."

ECF# 36-2, p. 2. It is significant that even the plaintiff's witness avers that

Saleh had said he could not deal with Dodson "anymore" because of her

behavior. The defendant lists Dodson's unusual, disturbing, unsettling,

threatening, and even criminal behavior leading up to Saleh's concession

that, "he cannot do it anymore" and to Saleh's exasperation in calling the

plaintiff, "crazy." The court finds the defendant's list and description of

Dodson's behavior to be largely uncontroverted and established in the first

50 pages of Exhibit 13, ECF# 35-12, the text messages between Dodson and

Saleh. In these text messages, the plaintiff calls herself "crazy." Finally,

before Saleh knew of her pregnancy, he had terminated Dodson in

September because of her behavior and its disruptive effect on the work

place. ECF# 35-12, pp. 31-32. Out of personal concerns for his family's

relationship with Dodson outside of work and for Dodson's own welfare,

Saleh allowed Dodson to keep working. As the text messages evidence,

Dodson's behavior did not improve but only became worse particularly after

her pregnancy and the additional cause for fighting with Fares. Shortly after

changing Dodson's shift, in October, Saleh texted Dodson to stop sending

him personal texts and only to communicate with him about work. Dodson

did not stop the text messages concerning her relationship with Fares. When

understood within its given context, Saleh's comment only expresses his

frustration with the difficult and complicated behavior by Dodson in their

personal relationship and with her inability to keep it out of the workplace. The comment does not create any genuine issue of pretext as to an unlawful discriminatory motive.

Dodson argues her only written warning came after Saleh learned of her pregnancy and shortly before her termination. The Tenth Circuit recognizes that "temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext." *Lounds v. Lincare, Inc.*, 812 F.3d at 1236 n.10 (quotation marks and citation omitted). The plaintiff lacks other evidence to sustain a reasonable inference of pretext. It is uncontroverted that Saleh infrequently used written warnings and did so here only at the urging of his night manager, Ashley Ayarza. Text messages exchanged before this written warning confirm that Saleh had repeatedly cautioned Dodson about her work behavior and attendance issues, that he had terminated her in September because of her behavior's impact on the work place and after she had shown up intoxicated at his house in the middle of the night, and that Dodson had believed her behavior on other occasions was such that Saleh was considering her termination. The timing of this written warning is hardly evidence of Saleh having a discriminatory motive. Instead, it is consistent with not only Saleh's plain and growing frustration with Dodson but also his willingness to follow his night manager's suggestions for dealing with Dodson's attendance and attitude issues. Finally, the plaintiff's summary opinion about her attitude and attendance

issues relative to other employees fails for lack of foundation and knowledge. For all these reasons, the court finds no genuine issue of pretext to be created by the timing of this only written warning.

The plaintiff points to her opinion and those held by some former employees about male favoritism at work. Evidence of favoritism based on gender is relevant. But to show pretext, the plaintiff's evidence and arguments must lead the court to believe that Saleh's reasons for changing her shift and then terminating her "are so incoherent, weak, inconsistent and contradictory that a rational factfinder could conclude they are unworthy of belief." *Bird v. West Valley City*, 832 F.3d 1188, 1205 (10th Cir. 2016)(internal quotation marks and citation omitted). The plaintiff's evidence fails to connect these opinions of favoritism to Saleh's decisions here. Instead, the text messages confirm Saleh's reasons for his decisions to be transparent and developing consistent with Dodson's increasingly difficult behavior.

The plaintiff's pretext argument culminates in Saleh's disparate treatment of her and Fares for workplace fighting. Saleh has articulated the business reasons for separating Dodson and Fares from working the same shifts and for changing Dodson's shift only. The plaintiff has not effectively controverted the defendant's evidence of the fighting between Dodson and Fares and its impact on the work place. The affidavits of co-employees describe the plaintiff's behavior at work as a "cause of workplace stress,"

ECF# 35-5, p. 1, as erratic and "crazy," ECF# 35-4, p. 1, and as "psycho," ECF# 37-1, p. 1. As fully discussed above, the plaintiff lacks evidence that a similarly situated male employee engaged in conduct as extreme and egregious as her own and was treated differently. The plaintiff has no evidence showing Saleh's reasons to be unworthy of belief or discriminatory on their face. The plaintiff does not controvert that she was a part-time server and that IHOP had other servers who could cover her shift. In contrast, Fares was a full-time employee, worked as a cook and the restaurant was short of cooks, and was Saleh's brother-in-law. Favoritism shown a relative is not a violation of Title VII. *See Clark v. Cache Valley Elec. Co.*, 573 Fed. Appx. 693, 697-98 (10th Cir. Jul. 25, 2014)("[O]ther motives such as friendship, nepotism, or personal fondness . . . suffice to remove the case from Title VII's anti-discrimination provisions. *See, e.g., Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1172-72 (10th Cir. 2007) (. . . .); *Neal v. Roche*, 349 F.3d 1246, 1251 (10th Cir. 2003)(. . . .); *Schobert v. Ill. Dept. of Transp.*, 304 F.3d 725, 733 (7th Cir. 2002)("Whether the employer grants employment perks to an employee because is a protégé, an old friend, a close relative or a love interest, that special treatment is permissible as long as it is not based on an impermissible classification.").").

It is uncontroverted that when he fired Dodson, Saleh's frustration had reached the point that he wanted no further contact with Dodson as he also asked Fares to move out of Saleh's home. From all the evidence of record, a

reasonable factfinder could not rationally find that Saleh's reasons for changing Dodson's shift and terminating her employer are unworthy of credence and, instead, he acted for the alleged discriminatory reasons. The defendant is entitled to summary judgment.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (ECF# 34) is granted on the grounds stated above with costs pursuant to Fed. R. Civ. P. 54(d)(1) taxed on the plaintiff.

Dated this 30th day of April, 2019, Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge